In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2308

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAUL A. CHILDS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 10026—**Michael M. Mihm**, *Judge.*

ARGUED MARCH 31, 2006—DECIDED MAY 15, 2006

Before ROVNER, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* Paul A. Childs is serving a lengthy prison term following his conviction on five counts of distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and of possession of a firearm in relation to drug trafficking in violation of 18 U.S.C. § 924(c). He appeals the denial of his motion to suppress evidence and his motion for a new trial or dismissal of the indictment.

As is fairly common in drug cases, a part of the government's evidence against Childs came from codefendants who flipped on him and confidential informants who

made controlled buys of drugs from him or his cohorts. It is the deceit of the informants and the government's failure to reveal that deceit to Childs' attorney in a timely manner that is at the heart of this appeal.

During an investigation in November and December 2002, two law enforcement agencies used three confidential informants to make controlled buys of crack from Elizabeth Crabtree, Arvie Murphy, and Childs. In mid-December, the agencies obtained search warrants for the residences of Crabtree and Childs. After the warrants were executed, Crabtree, Murphy, and Childs were arrested. Ultimately, Crabtree and Murphy became government witnesses at trial.

The informants—Alan Logston, Kim Franks, and Elizabeth "Sissy" Froehlich—-also testified. All three said they arranged to purchase crack from Childs by calling him on his cell phone. After the first controlled buys, a McLean (Illinois) County judge authorized the recording of other phone calls and transactions.

Informant Logston had known Childs for about 25 years. Logston, who had a significant criminal record, was a crack addict. He bought between $100 and $200 worth of crack a day from Childs during the summer of 2002. In order to pay his bills, Logston talked to Inspector Troy Doza of the Illinois State Police Drug Task Force, with whom he had previously worked as an informant, and told him that he could purchase drugs from Childs. On four occasions, Doza gave Logston money to purchase crack. Logston arranged for the purchases with Childs over the phone. The first three times, Logston received the crack from Crabtree, and the last time, it was delivered by a man in a parking lot. Doza searched Logston before and after each delivery. For his services, Logston was paid $400. Although Doza did not know it at the time, Logston was buying crack from other dealers and using it during the time he was working as an informant.

On cross-examination during Childs' trial, Logston admitted that on three occasions, rather than the one bag he turned over to Doza, he actually purchased two bags. His scheme, which we think would certainly turn most stomachs, was disgustingly simple: he would swallow one of the bags, give one to Doza, and later, when on his own, vomit up the swallowed bag and smoke the crack. Logston told Doza about this deception a week before trial. Doza told the prosecutors but they did not tell Childs' attorney, who, upon learning, during trial, of the deception and the prosecutors' failure to notify him, promptly moved for dismissal of the indictment. After much discussion, the presiding judge, the Honorable Michael M. Mihm, denied the motion.

As if hiding Logston's deception weren't bad enough, during the discussion preceding Judge Mihm's ruling, the prosecutors announced that a second informant, Froehlich, had admitted the evening before that she had hidden some of the crack from the investigators on all three controlled buys she made.

The story of Froehlich's involvement in this case begins after her release from a 4-year prison sentence. Soon after her release she began using $400 worth of crack a day. She became an informant and made 18 buys from various people under the direction of Detective Robert Wall. During this time she met Childs, was briefly involved with him sexually, and began buying crack from him almost daily.

She told Wall that she could buy from Childs and subsequently made three controlled buys. Detective Wall searched her before and after her meetings with Childs. Despite his searches, on the first buy she bit open the bag of crack and took out approximately .5 grams of crack and hid it in a hole in one of her teeth—a trick we have not had satisfactorily explained to us. Wall questioned her about the tear in the bag; she told him that Childs opened the bag to show her that the crack was the correct color. Wall accepted

the explanation, despite the fact that the bag was transparent. On the other two buys, Froehlich convinced Childs to give her a free sample when she was purchasing the crack for Wall. Childs gave her a "fat 20"—about .2 grams. She hid these amounts in her tooth as well. Wall checked her mouth after the first two buys but found nothing. He did not check after the third buy. Froehlich smoked the crack she hid from Wall and used some of the $7,145 she was paid as an informant to buy crack from other dealers.

At trial, Froehlich's testimony showed that she had revealed her deception well before the time the prosecutors indicated that she had. (Recall that they said they found out the night before they informed Judge Mihm.)

Q: Then you didn't actually tell the truth about taking that crack out of the bag until when?

A: Within the last few weeks.

Q: Well, in fact wasn't it last Tuesday night that you told the prosecutors that you had in fact taken crack cocaine from that bag?

A: No. It was prior to that, sir.

Q: Who did you tell prior to that?

A: I told the U.S. Attorneys.

Q: Prior to the beginning of the trial?

A: Yes.

Q: Did you tell Detective Wall that prior to trial?

A: He was aware of that because he was in a meeting.

Q: He was also present when you told—

A: Yes.

Q: —the prosecutors that?

A: Yes.

Q:  Did you volunteer it or were you questioned about it?

A:  I volunteered it, sir.

Q:  Did you tell them at the same time that you had taken crack cocaine from the original source of the crack before it was packaged and given to you on those other two occasions?

A:  Yes.

Q:  Is that the first time you told either the police or the prosecutors during your preparation for trial?

A:  Yes.

Detective Wall corroborated Froehlich's testimony, saying that he learned Froehlich had lied to him when "we began to prepare for this trial." He also said the prosecutors knew before trial began.

Kim Franks was also a crack addict who agreed to cooperate with the police after an arrest on a charge of delivery of a controlled substance. She told Detective John Heinlen that she could purchase crack from Childs, whom she had known from school. At Heinlen's direction, she purchased crack from Childs on three occasions.

Other evidence at trial included the testimony of Crabtree, who had been Childs' girlfriend. She said she sold drugs for him and that he carried a handgun for protection. Murphy, Childs' cousin, also testified. When he was paroled from prison in the fall of 2002, he began living with Childs and selling drugs for him. Murphy was the man in the parking lot who sold drugs to Logston. In addition, when Childs was arrested, he was in possession of currency used in purchases Logston and Froehlich had made.

After the testimony of the informants and the case agents regarding the deceit, Childs' counsel made a motion to suppress evidence. Judge Mihm denied that motion. He also

denied motions to dismiss the indictment and, after Childs was convicted, a motion for a new trial as well.

In this appeal, Childs argues that this is a proper case in which to establish the principle that outrageous government misconduct requires dismissal of criminal charges and that, in fact, the government misconduct meets that standard. Although we are dismayed, as was Judge Mihm, by the conduct of the government, we are not convinced that dismissal of the indictment or a new trial is required.

We review the denial of a motion for a new trial for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. We will not set aside a jury verdict if there is a reasonable basis in the record to support it. *United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003). The parties here agree that a decision to dismiss charges against a defendant on the basis of outrageous government misconduct is also reviewed for an abuse of discretion. *See United States v. Jordan*, 316 F.3d 1215 (11th Cir. 2003).

The government has an obligation to disclose, prior to trial, impeaching evidence and evidence favorable to a defendant, *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Gonzalez*, 93 F.3d 311 (7th Cir. 1996). To prevail on a *Brady* claim, the defendant must show (1) that the evidence was favorable to him because it was exculpatory or impeaching; (2) that the government willfully or inadvertently suppressed the evidence; and (3) that the defendant suffered prejudice as a result. *United States v. O'Hara*, 301 F.3d 563 (7th Cir. 2002). To establish prejudice, a defendant must establish a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Strickler v. Greene*, 527 U.S. 263 (1999).

Childs meets the first two requirements. This was impeachment evidence and the government willfully suppressed it—more about that later. However, Childs cannot show that he was prejudiced.

Childs' inability to show prejudice is, in part, a function of his having a very skillful defense attorney (Robert Alvarado, an assistant Federal Defender from Peoria) at his side. Counsel was able to thoroughly impeach the witnesses once the information was belatedly made available. Nevertheless, Childs contends that, had he known of the deceit earlier, he might have offered an entrapment defense. He does not explain exactly how the information would have provided him with an entrapment defense he did not have without it, and we are at a loss to guess. Judge Mihm did not abuse his discretion in determining that no prejudice existed.

Perhaps knowing he cannot show prejudice, Childs requests that we dismiss the indictment on the basis of outrageous government conduct. Despite our displeasure at the conduct of the government lawyers, however, we are not convinced this is the sort of case where such a bold step is called for.

True, the Supreme Court has left open the possibility of giving Childs the relief he requests. In *United States v. Russell*, 411 U.S. 423, 431-32 (1973), the Court stated:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed. (Citation omitted.)

But we have never taken what we see to be an extreme step of dismissing criminal charges against a defendant because of government misconduct. *See United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995); *United States v. Miller*, 891 F.2d 1265 (7th Cir. 1989). Granting such relief in the absence of

prejudice to a defendant would be to confer an unearned windfall.

That said, as is also surely clear by now, we are convinced that the conduct of government was designed to deliberately mislead the court and defense counsel. The transcript of the proceedings speaks for itself. It shows the stonewalling the prosecution engaged in. Detective Wall's answer to questions about the timing of the discovery of the deception was all too often, "I do not recall." Judge Mihm had the following exchange with the prosecutors:[1]

> MR. CAMPBELL: That was approximately a week or so ago.
>
> THE COURT: Was it before—
>
> MR. CAMPBELL: A week or so before trial.
>
> THE COURT: Well, why wasn't that information conveyed prior to trial?
>
> MR. CAMPBELL: We had to confront her about it and try to figure out what it was she had done and how she had done it.
>
> THE COURT: I don't understand that. I mean how did you learn about it? She says she told you.
>
> MR. CAMPBELL: Well, I think that that may not be quite how it happened because I think she was confronted by us

---

[1] The prosecutors in this case were Assistant United States Attorneys Bradley Murphy and John Campbell from the Central District of Illinois. Judge Mihm indicated on the record that he had never previously known either attorney to fail to act in good faith. That said, he expressed dismay at their handling of the problems that arose in this case.

> with the transcript information, actual words in which she said—

THE COURT: Did you confront her with this prior to trial?

MR. CAMPBELL: Yes, we did.

THE COURT: Why didn't you tell defense counsel about it prior to trial?

MR. CAMPBELL: We talked to her last night again and reviewed it with her and we did tell him, defense counsel.

THE COURT: He didn't learn this until last Tuesday or Wednesday.

MR. CAMPBELL: I believe that's the first time we told him.

THE COURT: Why didn't you tell him?

MR. CAMPBELL: I'm not sure, Your Honor, why we didn't. There was a transcript. The transcription was part of the problem, trying to sort out what it was we could confirm, whether it was true or not, whether it even happened or not, so it was in that rush to get to trial that we didn't do that apparently.

Campbell's explanation is weak and unconvincing and makes it appear, at least, that there was a deliberate effort to hide the facts from the court and defense counsel. After this fiasco, one would hope that the office of the United States Attorney is bending over backwards to regain the good opinion of Judge Mihm and this court.

The final issue is whether the motion to suppress evidence—made following the revelations at trial about the shenanigans of Logston and Froehlich—should have

been granted. Judge Mihm denied the motion as well as Childs' request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). On the final day of trial, when Childs renewed his request for suppression of the evidence, he conceded that the trial, in essence, constituted a full *Franks* hearing. Our review, then, is that appropriate for a denial of a motion following a *Franks* hearing—that is, for clear error. *United States v. Whitley*, 249 F.3d 614 (7th Cir. 2001).

Warrants are presumed to be valid. Under *Franks*, two levels of inquiry are required: first, was the false information included intentionally or recklessly, and, next, was the affidavit, when stricken of the false information, nevertheless sufficient to establish probable cause for the issuance of the warrant. At bottom, Judge Mihm concluded that, when the officers applied for the warrant, they did not know about Logston's or Froehlich's theft of some of the drug evidence. We agree. Shortly before trial, but after the application for the warrant, it became clear that the informants were unreliable, but there is no evidence that the officers had that information at the time they applied for the warrants.

Furthermore, even were the evidence provided by Logston and Froehlich set aside, the information regarding controlled buys made by Kim Franks supports the issuance of the warrants. Her reliability was not in question. We cannot find clear error in the denial of the motion to suppress evidence.

Accordingly, Mr. Childs' judgment of conviction is AFFIRMED.

No. 05-2308 11

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*