## In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-1118 & 09-2245

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ELIAS MUNOZ and ELIAS MARQUEZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-CR-00224—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED APRIL 9, 2010—DECIDED JULY 9, 2010

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* This is the consolidated appeal of two defendants who were convicted of participating in large document forgery operation known as the Leija-Sanchez Organization (the "Organization"). This group provided false green cards, driver's licenses, and social security numbers to illegal immigrants. Elias Marquez was accused of being an "office manager" of sorts for the Organization and producing fraudulent documents

himself. Elias Munoz was accused of being a photographer for the Organization. Both defendants pleaded guilty and challenge only their sentences. Marquez, who received an above-guidelines sentence of 60 months of imprisonment, argues that he should have received a two-level reduction for a minor role in the offense and a three-level reduction for acceptance of responsibility. He also challenges the substantive reasonableness of his sentence. Munoz, who received an above-guidelines sentence of 48 months of imprisonment, challenges the substantive reasonableness of his sentence and the district court's order that he use his earnings from the inmate financial responsibility program to pay his fine. We affirm both sentences, but modify Munoz's judgment to make clear that participation in the inmate financial responsibility program is voluntary.

## I. Background

The Leija-Sanchez Organization was a large conspiracy dealing in fraudulent documents that operated for over fifteen years in the "Little Village" area of Chicago, along 26th Street between Albany and St. Louis. The Organization produced and sold fraudulent documents including resident alien cards, social security cards, driver's licenses, and state identification cards. The Organization also smuggled illegal aliens to Chicago to serve as street vendors known as "miqueros." Scattered throughout the parking lot at the discount mall at Albany and 26th Street, these miqueros would sell false identification documents to passing pedestrians and motorists.

When a miquero found a paying customer, he took that customer to Munoz's photo shop. Munoz owned and operated the photo shop since 1994. Munoz would provide the customer with a blank form printed in both English and Spanish on which the miquero would record the name, address, date of birth, and other identifying information the customer wished to have appear on the fraudulent document. Munoz then created identification photographs of the customer with a background suitable for the type of identification document the customer was purchasing. The government estimates the revenue derived by Munoz from these photographs—which sold for $10 to $20 each–as at least $364,000 per year.

Once a miquero accumulated enough orders from customers, he would use a "runner" to send the orders to the facility—the "office"—where the false documents were made. From at least April 2006, Marquez worked in "the office," where he manufactured false documents, resolved payment disputes, and directed the miquero's daily operations.[1] At trial, the government introduced recorded telephone conversations of Marquez engaging in these activities; for example, inquiring about the status of a miquero who had been arrested by the police,

---

[1] In fact, Marquez may have played multiple roles in the conspiracy, starting as a miquero in the early 1990s. Marquez was arrested in 1995, with five sets of false documents in his possession, and deported to Mexico. It is unclear if Marquez was working for the Leija-Sanchez Organization at this time, but he was involved in selling false documents.

directing a different miquero to get current on money he owed the Organization, and explaining which miqueros would work which shifts on a given day.

Munoz, Marquez, and 21 other individuals were indicted on July 3, 2007. On July 8, 2008, Munoz pleaded guilty to conspiracy to produce false identification and immigration documents, in violation of 18 U.S.C. § 371. On September 10, 2008, the government filed a superseding information against Marquez, charging him with one count of conspiracy to unlawfully produce identification and immigration documents in violation of 18 U.S.C. § 371, and one count of producing identification documents in violation of 18 U.S.C. §§ 1028(a)(1) and (2). Marquez pleaded guilty to the superseding information the next day.

Following a January 6, 2009, sentencing hearing, the district court sentenced Munoz to 48 months of imprisonment, to be followed by two years of supervised release, and imposed a $500 fine. Marquez's sentencing hearing was held on April 29, 2009; the district court sentenced him to two 60-month terms of imprisonment, to be served concurrently, followed by three years of supervised release, and imposed a fine of $1,000.

## II. Analysis

### A. Marquez

We begin with the issues presented by Marquez. Marquez first argues that the district court erred in denying him a three-level reduction for a mitigating role

in the offense. We review a district court's interpretation and application of the sentencing guidelines de novo and its fact-finding for clear error. *See United States v. Haynes*, 582 F.3d 686, 708 (7th Cir. 2009). Because it rests on a finding of fact by the district court, we review the district court's denial of a mitigating role reduction for clear error, and will reverse only if our review of the evidence leaves us "with a definite and firm conviction that a mistake has been committed." *Id.* at 709 (quoting *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008)).

The sentencing guidelines provide a detailed system for weighing a conspirator's role in the offense. If a defendant was a minimal participant, he is entitled to receive a four-level decrease. If he was a minor participant, he is entitled to a two-level decrease. For those whose role fell between minimal and minor participation, a three-level decrease is appropriate. *See* U.S.S.G. § 3B1.2.

Marquez claims that he fell between a minimal and minor participant because his job was simply to follow the orders of the leaders of the Organization and, specifically, an individual by the name of "Bonaficio." Marquez argued at sentencing that the recorded phone calls do not show him directing the miqueros and negotiating with them over debts owed to the Organization on his own authority, but instead show him relaying the commands of Bonaficio.

At sentencing, the government argued that Marquez should have received a three-level enhancement for his role in the conspiracy. The government maintained that

the wiretapped conversations showed that Marquez was a "middle manager" for the conspiracy. The government also relied on the fact that more than $200,000 of the conspiracy's cash was found in Marquez's closet.

The district court concluded that Marquez's telephone conversations were inconclusive as to his decision-making responsibility and noted that Marquez had not recruited anyone into the conspiracy. On the other hand, it found that Marquez was more involved in the conspiracy than the miqueros he supervised. The district court therefore rejected both parties' arguments for a role-in-the-offense adjustment.

We find no error in the district court's decision not to give Marquez a mitigating-role reduction. Indeed, he appears to have received the benefit of the doubt at sentencing, as the district court found the evidence inconclusive as to whether he was in fact a "middle manager." Even if Marquez was not an autonomous decision-maker, he was still entrusted with significant administrative duties and a large quantity of the Organization's cash was found in his home. These two factors alone suggest that his role was at least as significant as that of a typical member of the conspiracy. Finally, we note that in calculating his guideline range, the district court relied only on the quantity of false documents for which Marquez was personally responsible. Thus, Marquez is not being unfairly punished for conduct that was unforeseeable to him based on his role in the conspiracy.

Marquez raises another challenge to his guidelines calculation. He argues that he should have received a

three-level reduction for acceptance of responsibility. Marquez pleaded guilty. However, a defendant is not entitled to an acceptance of responsibility reduction merely because he pleaded guilty. *See United States v. Krasinski*, 545 F.3d 546, 554 (7th Cir. 2008). The district court declined to find that Marquez accepted responsibility because it found that Marquez untruthfully minimized his participation in the conspiracy, was unforthcoming at his plea hearing, and falsely denied knowing that his conduct was a crime. We have previously affirmed district courts who denied a defendant an acceptance of responsibility reduction after the defendant attempted to minimize his level of involvement in an offense. *See, e.g.*, *United States v. Fiore*, 178 F.3d 917, 925 (7th Cir. 1999); *United States v. Jones*, 52 F.3d 697, 701 (7th Cir. 1995). Marquez argues that he cannot lose acceptance of responsibility for making legal arguments challenging his sentence. *See United States v. Purchess*, 107 F.3d 1261, 1267 (7th Cir. 1997). But Marquez made factual claims the district court found untruthful, rather than legal arguments based on admitted facts. Marquez has not pointed to any evidence that casts doubt on the district court's factual findings (indeed, his previous deportation for distributing false documents makes his claim that he did not know he was committing a crime implausible on its face). Thus, the district court did not err in denying Marquez an adjustment for acceptance of responsibility.

Next, Marquez argues that the district court failed to provide an adequate statement of the reasons for the sentence it imposed. Marquez identifies two supposed

deficiencies in the district court's explanation: first, he claims that the district court failed to clearly state what guideline range it was applying; and second, he claims that the district court failed to explain why it was imposing a 60-month sentence on Marquez.

The first alleged error stems from a dispute over the proper application of Application Note 5 to U.S.S.G. § 2L2.1. Section 2L2.1 contains enhancements for document-trafficking offenses based on the number of documents involved. The maximum enhancement is 9, for offenses involving 100 or more documents. Application Note 5 states: "If the offenses involved substantially more than 100 documents, an upward departure may be warranted."

At Marquez's sentencing, the district court rejected Marquez's argument for an acceptance of responsibility reduction and decided that no reduction or enhancement for his role in the offense was appropriate. The district court then clearly stated that it had calculated an adjusted offense level of 20, with a criminal history category of 1, for a guidelines sentence of 33 to 41 months of imprisonment. After stating the guideline range, the district court turned to the impact the number of documents should have on the sentence. The government argued that under § 2L2.1, an additional 12-level increase was appropriate based on the number of documents, which would have resulted in a base offense level of 32

and a guidelines range of 121 to 151 months.[2] Marquez argued that the number of documents should be offset by the personal characteristics of the defendant and his work history. Both parties made their arguments regarding the § 3553(a) factors at this time. After the district court's own discussion of the § 3553(a) factors, it imposed a 60-month term of imprisonment on Marquez.

We find that the district court's explanation of the guideline range was satisfactory. Under the advisory guideline system, "departures" have been rendered obsolete. *See United States v. Blue*, 453 F.3d 948, 952 (7th Cir. 2006). The district court's duty was to calculate the advisory guideline range properly, and then come up with a reasonable sentence under § 3553(a). *See Gall v. United States*, 552 U.S. 38, 51 (2007). Rather than adjusting Marquez's advisory guideline range based on the number of documents involved, the district court appropriately waited until after the guidelines range was calculated to determine whether the number of documents involved, combined with the other aspects of his offense and his personal characteristics, warranted a sentence above the advisory guideline range.

---

[2] The government actually advocated for a sentence in the range of 78 to 97 months, which would have been the guideline range if the district court had agreed with the government's position that U.S.S.G. § 2B1.1, rather than § 2L2.1 applies. The government did not cross-appeal, so we assume without deciding that § 2L2.1 is the correct guideline for Marquez's crime.

Marquez also argues that the district court failed to give sufficient consideration to the § 3553(a) factors. He frames this challenge, at least in part, as a failure to adequately state reasons under § 3553(c). To the extent he relies on § 3553(c), his argument fails. Section 3553(c) does not create a statutory duty to make a detailed recitation of the § 3553(a) factors. *See United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1047 (7th Cir. 2005). The district court gave a lengthy explanation of the circumstances of Marquez's crime, describing him as a significant player in the Organization and someone in whom the Organization placed a significant amount of trust. The district court also noted that Marquez was well-educated and had been employed in Mexico, and that unlike many of the miqueros he was not driven by poverty to participate in the conspiracy. The district court discussed the impact on the victims and the community and the number of documents, which struck the court as far in excess of what the drafters of § 2L2.1 had contemplated. This detailed exposition is more than enough to satisfy the procedural requirement in § 3553(c) that the district court adequately explain its sentence.

Finally, Marquez argues that his two concurrent 60-month sentences are substantively unreasonable. In support of this argument, he claims to have returned to this country to try to obtain a better life for himself by earning enough money to support his family, not with the intent to commit more crimes. He also suggests that his criminal history is minimal, consisting only of two arrests that were over ten years old. The government counters by arguing that an above-guide-

lines sentence was warranted given the nature of the offense and Marquez's personal characteristics. They note that Marquez conceded creating approximately 30,000 documents, and that other circuits have upheld above-guidelines sentences in cases involving far fewer documents. *See United States v. Vargas*, 73 Fed. Appx. 746, 747 (5th Cir. 2003) (upholding two-level upward departure for 2,700 sets of documents); *United States v. Velez*, 185 F.3d 1048, 1051 (9th Cir. 1999) (affirming above-guidelines sentence of 57 months for offense also involving at least 2,700 immigration files). Finally, the government argues that the district court properly took into account the fact that Marquez was educated, had stable employment, and owned real property in Mexico.

The district court did not abuse its discretion in imposing an above-guidelines sentence on Marquez. The sentencing guidelines explicitly contemplate an upward departure when more than 100 documents are involved in this type of offense. *See* Application Note 5, U.S.S.G. § 2L2.1. The number of documents for which Marquez was personally responsible is far in excess of this number. Without suggesting that sentencing can be reduced to mathematical formulae, *see United States v. Omole*, 523 F.3d 691, 698 n.1 (7th Cir. 2008), we note that Marquez received a sentence that is roughly 50% more than his advisory guideline range for an offense that involves 300 times as many documents as the largest quantity contemplated by the guidelines. Moreover, the record supports the district court's inference that Marquez reentered this country for the specific purpose of committing this crime, not out of poverty or despera-

tion, after having previously been deported while in possession of several sets of fraudulent documents. A sixty-month sentence cannot be considered excessive when considered in light of § 3553(a) and the specific characteristics of Marquez and his offense.

## B. Munoz

We now turn to the two issues raised by Munoz in his appeal. Like Marquez, Munoz argues that his sentence was substantively unreasonable. Munoz's advisory guideline range was 27 to 33 months. At sentencing, the district court said that the number of documents involved called for a statutory maximum sentence of 60 months. The court then imposed a lower sentence, of 48 months, in view of mitigating circumstances that included Munoz's "relatively advanced age" (he is in his 50s) and the near-certainty that he would be deported after prison and thus separated from his large family in the United States, most of whom are American citizens.

Munoz argues that the district court placed too much weight on the number of documents. He notes that other courts which have applied Application Note 5 of U.S.S.G. § 2L2.1 have allowed increases of only two or three levels. *See Velez*, 185 F.3d at 1051 (affirming two-level upward departure because at least 2,700 immigration files were involved); *United States v. Smith*, 236 Fed. Appx. 69, 70-71 (5th Cir. 2007) (affirming two-level increase "because the offense involved substantially more than 100 documents"); *Vargas*, 73 Fed. Appx. 746, 747 (5th

Cir. 2003) (affirming two-level increase in another case involving 2,700 documents); *United States v. Perez*, 90 Fed. Appx. 168, 169-71 (7th Cir. 2004) (affirming departure equivalent to three offense levels for leader of enterprise that manufactured and sold at least 500 sets of documents). To reach an advisory guideline range encompassing the 60-month sentence Munoz received, given his criminal history category of II, Munoz's sentence would have had to have been enhanced by six levels.

The district court did not abuse its discretion when it sentenced Munoz to 48 months of imprisonment. At the outset, we note that the question before us is whether the nature and circumstances of the offense and the personal characteristics of the defendant, considered in light of the § 3553(a) factors, justifies the sentence imposed. Once the district court properly calculated the guideline range, it was free to impose a reasonable above-guidelines sentence. *See United States v. Bartlett*, 567 F.3d 901, 909 (7th Cir. 2009). Munoz's daily participation in the conspiracy lasted well over a decade, and earned him more than a million dollars in illicit revenue. Munoz received a sentence, 48-months, lower than the sentences imposed in the cases cited by Munoz. *See Smith*, 236 Fed. Appx. at 69 (51 months); *Velez*, 185 F.3d at 1048 (57 months); *Perez*, 90 Fed. Appx. at 169 (96 months). Finally, it is clear that the magnitude of Munoz's offense is beyond the contemplation of the sentencing guidelines, which only included enhancements for up to 100 documents. *See* Application Note 5 to U.S.S.G. § 2L2.1. All these factors suggest that a sentence fifteen months above the advisory guideline range

is reasonable. But even if we consider the question as Munoz has framed it—whether the number of documents imposed would have warranted a six-level increase—we do not think the district court erred. The cases on which Munoz relies involved at most 2,700 documents. Munoz was responsible for more than 100,000 documents. Under his logic, Munoz's sentence reflects an enhancement two or three times larger than similar defendants have received for a crime involving more than 35 times as many documents as these other defendants' crimes. To the extent this increase may be out of step with other decisions interpreting Application Note 5, it is in a direction that is favorable to Munoz. Munoz did not receive an unreasonably long sentence.

Finally, Munoz argues that the district court erred by mandating that he participate in the Inmate Financial Responsibility Program ("IFRP"). At sentencing, the district court imposed a fine of $500 "to be paid from prison earnings and thereafter, after Mr. Munoz is released from custody, at the rate of 10 percent of his net earnings per month." The judgment states that Munoz is "to begin making payments toward the fine imposed through inmate financial responsibility program earnings." Munoz did not object at sentencing, so we review for plain error. *See United States v. Olano*, 507 U.S. 725, 731-35 (1993).

Munoz is correct that participation in the IFRP is voluntary. *United States v. Boyd*, ___ F.3d ___, 2010 WL 2330395, at *4 (7th Cir. June 11, 2010). The government concedes as much, but argues that the district court

did not actually mandate participation in the program, but rather implicitly made its order to make payments "from prison earnings" contingent upon Munoz's participation in the IFRP. In *Boyd*, we rejected this argument, concluding that "written instruction that the monetary sanctions are 'to be paid through' the IFRP . . . plainly ordered [the defendant] to participate in the IFRP." *Id.* at *3. In *Boyd*, as here, the defendant failed to object and we reviewed for plain error. *Id.* Thus, the district court's order here also amounts to plain error. However, because the district court did not link participation in the IFRP to other aspects of the sentence and the sums involved are modest, remand is unnecessary. *Id.* at *4. Instead, we modify the district court's sentence to clarify that Munoz's participation in the IFRP is voluntary.

### III.  Conclusion

For the foregoing reasons, the district court's judgment as to Elias Marquez is AFFIRMED and the district court's judgment as to Elias Munoz is AFFIRMED AS MODIFIED.