In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2297

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ONDRAY McKNIGHT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cr-00263-4—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 29, 2011—DECIDED NOVEMBER 22, 2011

Before RIPPLE, MANION and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After a four-year investigation
by the Drug Enforcement Administration ("DEA") and
the Chicago Police Department, a grand jury indicted
Ondray McKnight and six codefendants for various
offenses arising from the organized distribution of con-
trolled substances. Mr. McKnight was charged with one
count of conspiracy to distribute a controlled substance,
21 U.S.C. § 846, and two counts of using a communication

facility (a telephone) to distribute a controlled sub-
stance, 21 U.S.C. § 843(b). Mr. McKnight pleaded not
guilty, and a jury convicted him on the conspiracy and one
of the communication counts. He was acquitted of the
other communication count. The district court sen-
tenced Mr. McKnight to 300 months' imprisonment to be
followed by a ten-year term of supervised release. It also
imposed a fine of $1,000, which it ordered paid through
the Inmate Financial Responsibility Program ("IFRP").
Mr. McKnight now appeals. He claims that a jury in-
struction relating to the Government's use of deceptive
investigative practices was improper and confusing.
He also challenges the district court's order that he par-
ticipate in the IFRP. We conclude that the district court
acted within its discretion in giving the instruction and
that, in any event, the instruction was not prejudicial to
Mr. McKnight. Further, the parties correctly agree that
participation in the IFRP is voluntary and that the sentence
must be modified in that respect. Accordingly, we affirm
Mr. McKnight's conviction and modify his sentence
with regard to the IFRP.

# I

## BACKGROUND

### A. Facts

In 2003, a confidential informant provided information
to the DEA that led to an investigation of Victor Thomp-
son, a high-ranking member of the Gangster Disciples
gang. Thompson managed a drug distribution network

that operated in a residential neighborhood on the south side of Chicago.[1] Thompson's network included various other individuals—some gang members, some not—who worked as dealers selling heroin, cocaine base and marijuana; suppliers providing drugs either directly to dealers or to Thompson for repackaging; and lookouts to warn other members of the conspiracy of nearby police officers. Members of Thompson's network frequently carried firearms and allegedly were involved in, although not indicted for, theft, robbery, kidnapping and other crimes.

During their four-year investigation into Thompson's network, DEA agents and officers of the Chicago Police Department gathered evidence by using techniques that have become common in the drug context: confidential informants, undercover officers, controlled buys, surveillance and wiretapping. As part of that effort, the Government obtained wiretap warrants in 2006 for several phones, including one belonging to Shawn Denton, who later became the Government's chief witness in this case. Law enforcement agents intercepted hundreds of phone calls related to the conspiracy. They also conducted controlled buys from numerous members of Thompson's network, including Denton, but none from Mr. McKnight.

---

[1] Thompson's network was based near the intersection of 116th Street and Stewart Avenue, but extended south from 115th Street to 119th Street and east from Halsted Street to Wentworth Avenue.

The investigation ended in 2007, with the Government's filing a criminal complaint against eight individuals. A grand jury returned a thirty-count indictment against Mr. McKnight and six codefendants that included charges of conspiracy, narcotics distribution, using telephones in furtherance of the conspiracy and weapons offenses. Thompson and Mr. McKnight's other codefendants accepted plea agreements at various points in the proceedings. Mr. McKnight pleaded not guilty and proceeded to trial.

## B. District Court Proceedings

At Mr. McKnight's trial, the Government introduced the testimony of three witnesses: DEA Agent Fernando Cervantes, who testified about the investigation of the Thompson drug operation; DEA chemist Robert Krefft, who testified very briefly and generally about cocaine and cocaine base (or "crack"); and Denton. Denton, who had been indicted on six charges, was cooperating with the Government in exchange for a favorable sentencing recommendation. As the Government's principal witness at trial, Denton provided testimony about the Gangster Disciples, Thompson's drug operation and Mr. McKnight's specific role in it, as well as his interpretation of the wiretap recordings.

Denton testified that Mr. McKnight began supplying Thompson's network with drugs in 2006. Mr. McKnight originally paid Thompson a weekly fee of $1,500 to provide Thompson's dealers with heroin, cocaine base and marijuana. After three months, Thompson sought to

increase his share of the profit by having Mr. McKnight supply him with wholesale quantities of heroin, which he would then repackage and distribute to his dealers. Mr. McKnight continued to supply Thompson's dealers directly with cocaine base and marijuana.

During Denton's direct examination, the Government played for the jury (and provided transcripts of) thirty-seven phone calls related to the conspiracy. Denton testified that he and other members of Thompson's network spoke in code to avoid detection by police; he deciphered these recorded conversations for the jury.[2] Denton also identified Mr. McKnight as a participant in twenty-eight of the calls and a topic of conversation in another seven calls, all of which implicated Mr. McKnight in illegal activity.

The Government also played recordings from several controlled buys in which an informant purchased drugs from Denton while wearing a hidden microphone. Denton identified Mr. McKnight as the source of the drugs he sold to the informant in those transactions.

Counsel for Mr. McKnight sought to undermine Denton's testimony as self-serving and unreliable. Throughout the trial, counsel focused on Denton's criminal activities and the favorable sentencing recommenda-

---

[2] For example, Denton testified that the phrase "our side" referred to crack. Trial Tr. vol. 2, 193, 203, Oct. 6, 2009. Similarly, Denton testified that "on the other side" meant heroin, *id.* at 202-03, and "personal" and "girlfriend" were code words for a firearm, *id.* at 221-23.

tion he expected to receive from the Government in exchange for his testimony. Mr. McKnight did not put on any evidence.

During the jury instruction conference, the Government proposed the following jury instruction:

> Sometimes the government uses undercover agents and undercover informants who may conceal their true identities in order to investigate suspected violations of law. In the effort to detect violations of the law, it is sometimes necessary for the government to use ruses, subterfuges and employ investigative techniques that deceive. It is not improper or illegal for the government to use these techniques, which are a permissible and recognized means of criminal investigation. Whether or not you approve of such techniques[] should not enter into your deliberations in any way.

R.227 at 38.

Mr. McKnight's attorney objected, contending that the principal case on which the Government relied to support the instruction, *Lewis v. United States*, 385 U.S. 206 (1966), was inapposite and that the defense had not called the Government's investigative techniques into question. The Government responded, "Judge, this is in here because, of course, the government did put on evidence of wiretaps and undercover agents and informants. And some jurors have issues with the government's use of those techniques in general." Trial Tr. vol. 3, 394, Oct. 7, 2009. Without further discussion, the district court

overruled the objection, stating, "I have given this instruction before. I don't think it's particularly problematic." *Id.* The district court included the language, with minor technical and grammatical adjustments, in its final instructions to the jury.

The jury convicted Mr. McKnight of conspiracy to distribute a controlled substance and of one count of using a communication facility to distribute a controlled substance. After denying Mr. McKnight's motion for judgment of acquittal and subsequent motion for reconsideration, the district court sentenced him to 300 months' imprisonment for conspiracy and 48 months' imprisonment for the communication count, to be served concurrently, followed by a ten-year term of supervised release. The court further imposed a special assessment of $200, due immediately, and a fine of $1,000 to be paid from prison earnings through the IFRP.

## II

## DISCUSSION

Mr. McKnight raises two arguments on appeal. First, he claims that the district court erred by giving the Government's proposed "deceptive investigative techniques" jury instruction and that the error was sufficiently substantial to have prejudiced the outcome of his trial. Second, he challenges the district court's order that he participate in the IFRP.

### A. Deceptive Investigative Techniques Instruction

At issue is the instruction that advised the jury that deceptive investigative techniques are lawful and that forbade jurors from letting their personal disapproval of such techniques influence their deliberations in any way. Mr. McKnight contends that the instruction is not an accurate statement of the law and is unsupported by the record. He claims that giving the instruction prejudiced his defense by confusing the jury about its obligation to evaluate Denton's credibility. The Government counters that the instruction is supported by *Lewis*, 385 U.S. at 208-09, and that, in any event, the instruction did not prejudice Mr. McKnight's defense.

We engage in a limited review of jury instructions, asking only "'if the instructions as a whole were sufficient to inform the jury correctly of the applicable law.'" *United States v. Curry*, 538 F.3d 718, 731 (7th Cir. 2008) (quoting *United States v. Woods*, 148 F.3d 843, 849 (7th Cir. 1998)). "We . . . review *de novo* whether a particular instruction was appropriate as a matter of law." *United States v. Borrasi*, 639 F.3d 774, 781 (7th Cir. 2011). "'If the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal.'" *Curry*, 538 F.3d at 731 (quoting *United States v. Lanzotti*, 205 F.3d 951, 956 (7th Cir. 2000)). We review the district court's decision to give a particular instruction for an abuse of discretion, *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010), affording substantial discretion to its choice of wording, *United States v. Noel*, 581 F.3d 490, 499 (7th Cir. 2009).

Reversal is warranted "only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *Curry*, 538 F.3d at 731; *see also Borrasi*, 639 F.3d at 781.

## 1.

Mr. McKnight contends that our decision in *United States v. Childs*, 447 F.3d 541 (7th Cir. 2006), demonstrates that the jury instruction in question is an inaccurate statement of the law. He submits *Childs* as support for the proposition that the jury may consider the investigative techniques of law enforcement in its deliberations. We cannot accept this reading of *Childs*.

In *Childs*, the Government relied on the testimony of several informants who, after purchasing drugs in controlled buys at the behest of law enforcement, had concealed some of the drugs for their own use. Although the prosecutor knew of this well in advance of trial, the Government failed to share that impeachment information with the defendant before trial. *Id.* at 542-44. We held that the prosecutor had failed to turn over *Brady* material, but concluded that the defendant was not prejudiced by the failure. *Id.* at 545. Despite the prosecutor's complicity, the information came out at trial, and the defendant was able to use it to impeach the Government's witnesses. *Id.* The issue of whether the jury can consider the Government's use of deceptive investigative techniques simply was not before us in *Childs*.

The Government relies primarily on *Lewis*, 385 U.S. at 208-09, to support the legal accuracy of the instruction.

In *Lewis*, the Supreme Court held that a federal narcotics agent did not violate the Fourth Amendment when he misrepresented his identity and conducted an undercover purchase of narcotics from the defendant in the defendant's home. *Id.* at 206-07. The Supreme Court noted that "it has long been acknowledged . . . that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." *Id*. at 208-09 (internal citations and footnote omitted); *see also United States v. Peters*, 153 F.3d 445, 464 (7th Cir. 1998) (Easterbrook, J., concurring) ("Police engage in deceit all the time in order to induce suspects to reveal evidence. . . . Deception plays an important and legitimate role in law enforcement.").

We believe that the Government's position is correct. Although *Lewis* did not address specifically jury instructions, we believe the Supreme Court's holding makes quite clear that the statement of law contained in the instruction before us is correct.


**2.**

We now turn to Mr. McKnight's further contention that the instruction, even if a correct statement of the law, was not appropriate in the context of this case. In Mr. McKnight's view, the instruction barred the jury from evaluating fully the credibility of Denton's testimony about Thompson's operations and about the meaning of coded telephone calls recorded during the investigation. He submits that the instruction effectively

permitted Denton to lie about Thompson's operations and about the interpretation of the phone calls. The jury was prohibited from considering, Mr. McKnight continues, that Denton could have been lying about the interpretation of those calls because his interpretation was also part of the investigation.

For its part, the Government takes the view that the district court simply recognized that the jurors were aware of the deceptive techniques employed by the Government and that some jurors might be expected to have negative opinions about the Government's engaging in such practices. It contends that the district court acted well within its discretion in giving the instruction in order to ensure that the jurors understood that their disapproval of the Government's methodologies was not relevant to their task.

We approach our review of the district court's decision mindful that tailoring jury instructions to ensure that the case is submitted to the jury in a full and fair manner is a quintessential task of the trial court. *See Noel*, 581 F.3d at 499 ("We . . . give the district court substantial discretion to formulate the instructions . . . ."). The judicial officer who presides over the entire trial proceedings, observes the witnesses, hears the substance and tone of counsels' arguments and both watches and assesses the jury's reactions is in the best position to determine the need for, and the scope of, any cautionary instructions with respect to the evidence. *See Curry*, 538 F.3d at 728.

We think that the decision as to whether to give this particular instruction is especially within the province

of the presiding trial judge. There will be times when circumstances arising during trial will counsel in favor of giving such an instruction. Some of these occurrences may be perceptible to us from the trial record; others, such as the facial expressions of the jurors or similar manifestations of disapproval, will be apparent only to the trial judge. At times, circumstances grounded in recent local events or local culture, of which the trial judge is especially cognizant, similarly might make the giving of such an instruction prudent. A trial court's obligation includes taking note of all such situations and acting to preserve the integrity of the record.

As the Government notes, this type of instruction is not new to this Circuit. In *United States v. Shields*, No. 90 CR 1044, 1992 WL 43239 (N.D. Ill. Feb. 20, 1992), Judge Rovner gave a similar instruction[3] and, on a post-trial motion

---

[3] The relevant instructions in *Shields* were as follows:

> The government has offered evidence in the form of tape recordings of conversations with the defendants. These recordings were made without the knowledge of the defendants, but (1) either with the consent and agreement of one or the other parties to the conversations, (2) by order of a judge in this building.

> The use of these procedures to gather evidence is perfectly lawful and the government is entitled to use the tape recordings in this case.

> * * *

> You have heard testimony from a cooperating witness who was employed by the government in an

(continued...)

for acquittal, determined that the instruction was appropriate because

> [t]he defendants themselves tended to place the propriety of the government's investigative techniques in issue at trial through their repeated *ad hominem* attacks upon [the Government's cooperating witness], references to him being "programmed" by the government, and description of [a lawsuit filed by the FBI to ferret out corruption in the Illinois judicial system] as a "phony case."

*Id*. at *19.[4] In *Shields*, the defendant challenged the Gov-

---

[3] (...continued)

> undercover capacity. There is nothing improper or illegal with the government using these techniques. Indeed, certain types of evidence would be extremely difficult to detect without the use of such witnesses.
>
> Whether or not you approve of the use of undercover work to defect [sic: detect] unlawful activities is not to enter into your deliberations in any way. If you are satisfied beyond a reasonable doubt that the defendants committed the offenses charged in the indictment, the circumstance that the government made use of undercover work is irrelevant to your determination.

*United States v. Shields*, 90 CR 1044, 1992 WL 43239, at *19 (N.D. Ill. Feb. 20, 1992) (alterations in original).

[4] The parties have identified no appellate case where a similar instruction has been evaluated against a similar challenge. The closest instruction appears to be in *United States v. Carona*,

(continued...)

ernment's use of deceptive investigative techniques. That factor no doubt constituted a more obvious case for judicial guidance to the jury. Yet the absence of such a factor in the present case does not, of course, absolve the presiding judicial officer from deciding whether the jury's knowledge of the use of such techniques might affect the integrity of the jury's deliberations.

At first glance, it might appear that the decision to give this instruction would be a rather straightforward one. After all, the techniques employed by the Government in this case are common investigative practices,

---

[4] (...continued)
630 F.3d 917, 924 (9th Cir. 2011), *amended by* No. 09-50235, ___ F.3d ___, 2011 WL 5041911 (9th Cir. Oct. 25, 2011), in which the jury was informed "that the government 'is not precluded from engaging in stealth and deception, such as the use of informants, in order to apprehend persons who have engaged in criminal activities.'" The defendant in *Carona* had alleged prosecutorial misconduct, specifically, that a confidential informant was used to obtain information from the defendant after the defendant retained an attorney to represent him during the investigation and prosecution. The appellate court found that there was no misconduct, and, therefore, that the district court did not abuse its discretion in limiting the defendant's request to introduce evidence of the alleged misconduct. The Ninth Circuit held that it was "[s]imilarly" not an abuse of discretion for the district court in that case to instruct the jury that the Government may lawfully engage in deceptive investigation techniques. *Id.*

used to investigate all manner of crimes.[5] Such tech-
niques are particularly prevalent in dealing with "orga-
nized criminal activities that are characterized by covert
dealings with victims who either cannot or do not pro-
test." *Lewis*, 385 U.S. at 210. Narcotics trafficking is a
"prime example." *Id*. Surreptitious investigatory practices
are frequently used to gather evidence of the manufacture

---

[5] *See, e.g.*, *Lewis v. United States*, 385 U.S. 206, 209 (1966) ("[I]n
the detection of many types of crime, the Government is
entitled to use decoys and to conceal the identity of its agents.");
*see also United States v. Rogers*, 587 F.3d 816, 818 (7th Cir. 2009)
(describing a police officer pretending, over the Internet, to be
a 13-year-old to gather evidence of a defendant's attempts
to entice a minor to engage in sexual activity); *United States
v. Watson*, 525 F.3d 583, 585-86 (7th Cir. 2008) (discussing the
FBI's use of an informant to elicit incriminating statements
from a robbery suspect); *United States v. Balistrieri*, 779 F.2d
1191, 1206-07 (7th Cir. 1985) (noting the use of confidential
informants, surveillance, undercover law enforcement, wire-
taps and surreptitious recordings in an organized crime in-
vestigation). Further, law enforcement officials are permitted
to, and often do, use "strategic deception" to elicit confessions.
*Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Ploys to mislead a
suspect or lull him into a false sense of security that do not rise
to the level of compulsion or coercion to speak are not within
*Miranda*'s concerns."); *see also United States v. Montgomery*, 555
F.3d 623, 632 (7th Cir. 2009) ("[P]recedent holds that a police
officer may actively mislead a suspect prior to obtaining
a statement or confession so long as a rational decision [to
confess] remains possible." (internal quotation marks omitted)).

or distribution of controlled substances.[6] Given the preva-lence of deceptive investigative practices, it might be argued that an instruction on their permissibility should be given as a matter of course. There can be no doubt that, in some instances, the instruction can serve as a useful, or even necessary, tool to focus the jury on its task and to remind it that, like the presiding judge, it has no roving commission to express disapproval of law enforcement techniques that are acceptable under estab-lished legal principles.

There are, however, countervailing considerations. We have recognized, for instance, that the giving of unneces-sary instructions raises the distinct possibility of clut-tering the instructions taken as a whole and, consequently, deflecting the jury's attention from the most important aspects of its task. *See, e.g.*, *United States v. Hill*, 252 F.3d 919, 923 (7th Cir. 2001) ("Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered."). There is also a possibility that singling out this aspect of the case might be interpreted by the jurors as at least

---

[6]  *See, e.g.*, *United States v. Childs*, 447 F.3d 541, 542 (7th Cir. 2006) ("As is fairly common in drug cases, a part of the government's evidence . . . came from codefendants who flipped on [the defendant] and confidential informants who made controlled buys of drugs from [the defendant] or his cohorts."); *see also United States v. Freeman*, 650 F.3d 673, 676 (7th Cir. 2011) (discussing a drug investigation involving "video surveil-lance, garbage pulls, controlled buys, and confidential infor-mants").

indirect approval of the effectiveness of the Government's management of the investigation.

The decision as to whether to give an instruction such as the one in question, of course, must be the product of an affirmative act of judicial discretion. Our difficulty here is that the district court did not elaborate on its reasons for giving the instruction. It is clear, however, that the court had the opportunity to focus on the possibility of juror prejudice from the Government's use of wiretaps in its investigation upon the Government's earlier submission of a motion to forbid defense counsel from suggesting jury nullification based on "[o]utrageous Government [c]onduct." R.229 at 6. In considering the instruction in question, the court was alerted specifically to the Government's specific concern about the effect of wiretap evidence.

Although the record provides very little affirmative information on the district court's reasoning for giving the instruction in question, we see nothing in this record to indicate that its decision to give the instruction constitutes an abuse of discretion. As Mr. McKnight forcefully argues, Denton's testimony was central to the Government's case. We do not share, however, Mr. McKnight's concern that jurors might have understood the challenged instruction to mean that they must take Denton's testimony at face value. First, the district court explicitly instructed the jurors that Denton was "hoping to receive benefits from the government[,] namely, a reduced sentence in this case" and that they should "give the testimony of Mr. Denton such weight

as [they] feel it deserves, keeping in mind that it must be considered with caution and great care." Trial Tr. vol. 4, 458, Oct. 8, 2009. This instruction underscored information the jury already had been provided; Denton testified about the terms of his deal with the Government on both direct and cross-examination, and Mr. McKnight's counsel questioned his credibility repeatedly and aggressively. Second, the challenged instruction refers to "undercover agents and undercover informants who may conceal their true identities" and to "ruses, subterfuges, and . . . investigative techniques that deceive." *Id.* at 465-66. Denton was neither an undercover agent nor an informant, nor did he assist in any Government ruse or subterfuge.[7] He was arrested for his role in the con-spiracy and cooperated only after the Government had concluded its investigation and initiated the prosecu-tions. We therefore cannot conclude that the challenged instruction prejudiced Mr. McKnight's defense.

**B.  Compelled Participation in the IFRP**

At sentencing, the district court imposed a fine of $1,000 and directed Mr. McKnight to make payments through the IFRP. Because Mr. McKnight did not challenge this portion of his sentence before the district court, we review for plain error. *See United States v. Munoz*, 610 F.3d

---

[7]  We note that Denton sold drugs to a confidential informant on several occasions. However, this activity makes Denton a target of the Government's investigation, not an accessory to the Government's subterfuge.

989, 997 (7th Cir. 2010). The Government concedes that sentencing Mr. McKnight to participate in the IFRP constitutes plain error. We agree.

We have described the IFRP as a program

> under which staff members from the Bureau of Prisons assist inmates in developing plans to meet their financial obligations. See 28 C.F.R. § 545.10. Inmates who do not participate may lose a number of privileges identified in 28 C.F.R. § 545.11(d), which include participating in [a certain] prison job training program, furloughs, and outside work details, and having higher commissary spending limits, access to higher-status housing, and access to community-based programs.

*United States v. Boyd*, 608 F.3d 331, 333 (7th Cir. 2010). We have held that the IFRP is a voluntary program, and, therefore, an order compelling an inmate's participation is plain error. *See Munoz*, 610 F.3d at 997; *Boyd*, 608 F.3d at 334 ("The IFRP can be an important part of a prisoner's efforts toward rehabilitation, but strictly speaking, participation in the program is voluntary. . . . [A]n inmate in the Bureau of Prisons' custody may lose certain privileges by not participating in the IFRP, but the inmate's participation cannot be compelled.").

To correct this error, Mr. McKnight requests only modification of his sentence. Such action is consistent with *Munoz* and *Boyd*. In both cases, we modified the sentence rather than remanding it to the district court. *Munoz*, 610 F.3d at 997; *Boyd*, 608 F.3d at 335. We also modify the

sentence here by striking the mandatory requirement that Mr. McKnight participate in the IFRP.

## Conclusion

We conclude that the district court did not commit reversible error by issuing the deceptive investigative practices jury instruction in this case. We therefore affirm Mr. McKnight's conviction. However, the district court should not have ordered Mr. McKnight's participation in the IFRP. Accordingly, we modify his sentence by striking that requirement.

AFFIRMED as MODIFIED