In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-3716

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTIAN PETERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 12-cr-87-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 28, 2015 — DECIDED MAY 25, 2016

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge*. Before running into legal trouble, Christian Peterson, an entrepreneur doing business in Madison, Wisconsin, owned several manufacturing and real-estate development firms. He misused corporate finances, frequently making unauthorized intercompany loans and occasionally using corporate funds to pay off his personal gambling debts. Eventually all of his business ventures failed, his companies defaulted, and federal agents launched

an investigation. Peterson was indicted on thirteen criminal counts—bank fraud, making false statements to banks, money laundering, and pension theft—and a jury found him guilty of eight of those crimes. On Peterson's motion the district judge entered judgment of acquittal on two counts and at sentencing imposed a within-guidelines prison term of 84 months on the remaining six.

Peterson has appealed, raising many issues for review. His arguments for judgment of acquittal or a new trial have no merit; the evidence was easily sufficient to support the jury's verdict. We also reject his claims of evidentiary and instructional error. Peterson next challenges the joinder of the pension-theft count for trial with the others, but this claim too is meritless. Regarding the sentence, the judge correctly calculated the gross receipts Peterson derived from his fraud; because he was the sole perpetrator, all proceeds of the fraud were properly attributed to him. But Peterson repaid in full a $300,000 wire transfer prior to detection of his fraud, so that sum should not have been included in the total loss amount. We affirm the convictions but vacate the sentence and remand for resentencing.

## I. Background

Two of Peterson's businesses are relevant to this case. The first is Maverick, Inc., which supplied polyurethane scrap-foam material to carpet-pad manufacturers. Peterson originally was the sole owner of Maverick, but in 2006 he acquired a partner, Dr. James Shapiro, who owned a 25% interest in the company. The other business relevant here is Peterson Properties of Chicago, LLC, which Peterson created to develop a parcel of land in Fitchburg, Wisconsin. Peterson had two partners in this venture: his Maverick partner,

Shapiro, and James Spahr, each of whom held a one-third interest in the company. Maverick and Peterson Properties each maintained lending agreements with different banks; these loan agreements figured prominently in the charges the government brought against Peterson.

**A. Maverick's Line of Credit at Marshall & Ilsley Bank**

Beginning in 2003, Maverick maintained a line of credit and a checking account at Marshall & Ilsley Bank ("M&I"). The credit line and checking account were linked through a "sweep" arrangement meant to provide flexibility for Maverick. Under this arrangement the credit line would automatically compensate for insufficient funds in the checking account. Conversely when the checking-account balance rose above a certain level, funds from that account were automatically applied to Maverick's credit balance. By 2008 Maverick's line of credit at M&I had increased from $1.5 million to $6.25 million.

Although the M&I credit line was limited by its terms to use for Maverick's business purposes, Peterson drew on it to fund his other companies. In March 2006 M&I banker Randy Paulson asked Peterson to discontinue this practice in light of the risks that it posed to M&I. Peterson agreed and promised to pay off any debts that his other companies owed to Maverick. However, when Peterson met with Paulson in May 2007 to discuss renewal of Maverick's credit line, the debt owed to Maverick by Peterson's other companies had increased by almost $2 million. Peterson again promised to stop using Maverick's credit line for anything other than purchasing scrap foam and to pay off all outstanding debts by the end of the year.

Peterson also drew on the M&I credit line to support his gambling habit. On April 5, 2006, Peterson had his office assistant contact M&I to request a $300,000 wire transfer to the MGM Grand casino in Las Vegas. When Paulson questioned why he wanted money wired to a casino, Peterson forwarded an e-mail from a commercial real-estate broker listing properties that he and the broker planned to visit the next day. Peterson sent a follow-up e-mail to Paulson a few minutes later stating, "This is my itinerary. I would not use Maverick funds for personal use and I certainly wouldn't spend $300k!!!" M&I wired the requested funds to the casino, and Peterson promptly used the money to pay off debts he had incurred at the blackjack tables.

All the while Maverick was experiencing a sharp downturn in business. It lost one of its main purchasers of scrap foam, and another of its major clients reduced its orders by 87% between 2006 and 2007. Maverick eventually defaulted on its credit, went into receivership, and ceased operations. In February 2009 Peterson terminated the 401(k) plan that Maverick had maintained for its employees since 2002 and instructed the plan's administrator to send him any remaining funds. Peterson subsequently received a check for just over $29,000, which he used for personal expenses. After learning that the plan had been terminated, one of the three participating employees confronted Peterson. Peterson reimbursed the plan in full.

**B. Loan from Greenwoods Bank to Peterson Properties**

In late 2007 Peterson Properties, the other Peterson company relevant here, obtained a loan from Greenwoods State Bank in Lake Mills, Wisconsin. The company had previously borrowed approximately $7 million from a different bank to

purchase and develop a tract of land in Fitchburg. By fall of 2007, the company was looking to refinance its existing loan and obtain additional funds for development.

To that end Peterson met with bankers at Greenwoods, giving them a personal financial statement. Greenwoods, in turn, offered Peterson Properties a $1.1 million loan. On Peterson's behalf, Greenwoods president Michael Weber filled out a loan application identifying the loan's purpose as land and site improvements for the Fitchburg property. On December 5, 2007, Peterson signed a closing statement and repayment note for the loan, both of which likewise identified land and site improvements as the loan's purpose.

All three partners in Peterson Properties personally guaranteed the Greenwoods loan. Spahr's guarantee was conditioned on his company, Landmark Building Systems, receiving the contract for any improvements that the Fitchburg tract required. On December 7, 2007, Peterson Properties entered into a contract with Landmark Building Systems to this effect. The contract, which Peterson signed on behalf of Peterson Properties, provided that Landmark would receive $893,580 to perform all site construction.

Peterson made three draws on the Greenwoods loan. The first occurred on December 6, 2007, and totaled $871,168.57. Of this amount Peterson paid $155,000 to Spahr for the starting costs of site construction. Peterson used the rest of the first draw to pay debts owed by Peterson Properties, $300,000 of his personal gambling debts, and a $250,000 developer's fee to himself. A week later, Peterson made a second draw of $100,000, which he deposited into Maverick's checking account at M&I. Another week later, Peterson made a third draw of $128,931.43 for legal fees associated

with the Fitchburg tract. This third draw completely exhausted the Greenwoods loan. Like Maverick, Peterson Properties soon collapsed and defaulted on its loan.

**C. Indictment and Trial**

After Peterson's companies defaulted, federal agents began a criminal investigation, and he was eventually indicted on 13 counts: engaging in a scheme to defraud banks in violation of 18 U.S.C. § 1344 (Counts 1–4); making false statements to a bank in violation of 18 U.S.C. § 1014 (Counts 5–8); money laundering in violation of 18 U.S.C. § 1957 (Counts 9–12); and pension theft in violation of 18 U.S.C. § 664 (Count 13). The case was tried to a jury, which was instructed that a bank's negligence is not a defense to fraud. The jury returned a verdict of guilty on 8 of the 13 counts.

Peterson filed a posttrial motion for judgment of acquittal, *see* FED. R. CRIM. P. 29(c), arguing that the evidence was insufficient to support the jury's verdict. The judge granted this motion in part, entering judgment of acquittal on one count of bank fraud and a related money-laundering count. Peterson then moved for a new trial on the remaining counts, *see* FED. R. CRIM. P. 33, and renewed an earlier motion regarding severance of the pension-theft count. The judge denied both motions. Peterson thus stood convicted of 6 of the 13 counts: the bank-fraud and false-statement counts arising from M&I's $300,000 wire transfer to the MGM Grand; the bank-fraud, false-statement, and money-laundering counts arising from the Greenwoods loan to Peterson Properties; and the pension-theft count in connection with the Maverick 401(k) plan.

At sentencing the judge applied two guideline enhance-ments that are relevant here. First, she found that Peterson derived $1,116,169 in gross receipts from his fraud: $300,000 from the M&I wire transfer to the MGM Grand and $816,169 from the Greenwoods loan. Based on this same calculation, the judge found that M&I and Greenwoods suffered losses in excess of $1 million as a result of Peterson's fraud. Given a base offense level of 7, a 16-level increase for total loss exceeding $1 million, and a 2-level increase for gross receipts exceeding $1 million, Peterson's total offense level was 25. *See* U.S.S.G. § 2B1.1 (2014).[1] Combined with Peterson's criminal-history category of III, this yielded a guidelines sentencing range of 70 to 87 months. The judge imposed an 84-month prison term on the M&I and Greenwoods fraud counts and a concurrent term of 60 months on the pension-theft count. This appeal followed.

## II. Discussion

### A. Rule 29(c) Motion for Judgment of Acquittal

Peterson first argues that the evidence on the M&I and Greenwoods fraud counts was insufficient for a reasonable jury to find guilt beyond a reasonable doubt. De novo review applies to the denial of a motion for judgment of acquittal; practically speaking, however, the standard of review is that for sufficiency of the evidence. *United States v. Johns*, 686 F.3d 438, 446 (7th Cir. 2012). We consider the evidence in the light most favorable to the government and affirm the conviction if any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*; *see also*

---

[1] All citations to the guidelines in this opinion are to the 2014 version under which Peterson was sentenced.

FED. R. CRIM. P. 29(c). Our task is not to "reweigh the evidence or invade the jury's province of assessing credibility"; rather, we will "overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir. 1997) (quotation marks omitted).

Four of the five counts challenged here were brought under §§ 1014 and 1344(2), both of which require proof of a false or fraudulent statement.[2] *United States v. Doherty*, 969 F.2d 425, 428 (7th Cir. 1992). Regarding the M&I fraud counts, Peterson argues that the government failed to prove that the statements he made to the bank were *false*. Regarding the Greenwoods fraud counts, he argues that the government failed to prove that he made *any* statement to the bank.

### 1. *M&I Fraud Counts*

For the M&I fraud counts, the false statement at issue is Peterson's e-mailed representation that the $300,000 wire transfer to the MGM Grand was not for personal expenses. Peterson does not dispute that he made this statement; he argues instead that the government failed to prove that it was false. Peterson's contention at trial was that the wire transfer was a distribution to himself in his capacity as a

---

[2] The fifth count charged money laundering under 18 U.S.C. § 1957 in connection with the false statements that Peterson made to Greenwoods. Because the money-laundering count is derivative of the false-statement count, judgment of acquittal on the latter requires judgment of acquittal on the former. Peterson does not raise an independent challenge to the evidence on the money-laundering count.

Maverick shareholder—a legitimate business expenditure under the terms of the M&I credit line. The jury rejected this claim, and reasonably so.

The government introduced substantial evidence that the wire transfer was not a shareholder distribution but instead was a direct use of Maverick funds to cover Peterson's personal gambling debts. First, Peterson did not identify the transfer as a distribution when he requested it; to the contrary, he told the bank that the money would be used to purchase real estate on behalf of Maverick. Second, Peterson did not treat the requested funds as a distribution: instead of depositing the $300,000 into a personal account, he had the money wired directly from Maverick's checking account to the MGM Grand. Finally, in a 2007 e-mail to Paulson, Peterson stated that Maverick did not make any shareholder distributions in 2006.

Peterson points to evidence that he claims supports his contention that the wire transfer was really a shareholder distribution, notably later-prepared financial records purportedly showing a $900,000 distribution in April 2006, one component of which was a $300,000 wire transfer. But the jury was entitled to disregard these financial records as a post hoc recharacterization intended to cover his tracks and rely instead on Peterson's conduct and statements at the time of the transfer. At bottom, Peterson's argument asks us to reweigh the evidence, which ignores the standard of review. *See United States v. Johnson*, 729 F.3d 710, 714 (7th Cir. 2013) ("We will 'overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.'" (quoting *United States v. Hill*, 618 F.3d 619, 637 (7th

Cir. 2010))). A reasonable jury could easily conclude that Peterson lied when he assured M&I that he would not use the requested funds for personal expenses. The judge properly denied his motion for judgment of acquittal on the M&I fraud counts.

### 2. *Greenwoods Fraud Counts*

On the Greenwoods fraud counts, the false statement at issue is the representation contained in Peterson Properties' loan application that the purpose of the loan was "land improvement and site improvement" for the Fitchburg tract. Peterson doesn't argue that this statement was true; after all, he used nearly the entire loan for purposes other than land and site improvements, including paying off debts owed by Peterson Properties, debts owed by Maverick, and personal gambling debts. He argues instead that the government didn't prove that *he* made any of the representations contained in the loan application. We disagree.

It's true that Peterson didn't fill out the loan application himself; that was done by Greenwoods president Michael Weber. The government's position at trial was that Weber did so at Peterson's direction and based on Peterson's oral representations. Weber testified to that effect, telling the jury that he filled out the application at Peterson's behest and based on information Peterson provided. The government also pointed to the fact that Peterson signed the closing statement and the note setting forth the terms of repayment just one day after Weber filled out the loan application, supporting an inference that Peterson directed Weber to complete the application and gave him the information to do so.

Peterson argues that Weber's testimony was too unreliable to support a finding of guilt because Weber admitted that his memory of this time period was "very sketchy" and he "couldn't remember any specific conversation with Peterson." Weber also testified that Peterson's business partner, Sweeney, could have been the person who provided the information he used to fill out the loan application. While these are plausible jury arguments, they don't carry the day on appeal. The jury considered these arguments and instead chose to credit Weber's testimony that it was Peterson who called the shots and provided the information for the loan application. Peterson's argument on appeal simply invites us to "second-guess the jury's credibility determinations." *See United States v. Green*, 648 F.3d 569, 578 (7th Cir. 2011). That we won't do. *See id.* ("We [will] overturn a conviction based on a credibility determination only if the witnesses' testimony was incredible as a matter of law … .").

Finally, Peterson relies on the Fifth Circuit's decision in *United States v. Jobe*, 101 F.3d 1046 (5th Cir. 1996), *abrogated on other grounds by United States v. Ochoa-Gomez*, 777 F.3d 278 (5th Cir. 2015), but that reliance is misplaced. In *Jobe* the Fifth Circuit concluded that a defendant who guaranteed a loan and then endorsed and accepted loan proceeds on the pretense that the funds would be used to purchase commercial inventory had not himself made a false statement for purposes of § 1014. *Id.* at 1054, 1064–65. The stated purpose of the loan in *Jobe* was set forth in a "loan presentation" prepared by bank staff, which the defendant never signed. Critically, however, it was undisputed in *Jobe* that the defendant "made no direct representations concerning the loan." *Id.* at 1064–65. Here, in contrast, Weber testified that Peterson provided the information contained in the loan

application. That testimony is sufficient to support the jury's verdict.

**B. Rule 33 Motion for a New Trial**

Peterson next argues that the jury's verdict on the M&I fraud counts was contrary to the manifest weight of the evidence, requiring a new trial. Rule 33 of the Federal Rules of Criminal Procedure permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." *See also United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) (indicating that a new trial is warranted "where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand"). Because the district judge is best positioned to make this determination, our review is highly deferential. *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998). We review the judge's decision for abuse of discretion, recognizing that "the exercise of power conferred by Rule 33 is reserved for only the most 'extreme cases.'" *Id.* (quoting *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)).

This is not "one of those rare cases in which consideration of the evidence leaves a strong doubt as to the defendant's guilt of the charged offense." *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999). As we've already explained, the government introduced substantial evidence from which the jury could conclude that Peterson lied when he told M&I that he would not use the $300,000 wire transfer for personal expenses. This evidence was neither incredible nor inherently unreliable. *See id.* (holding that the defendant was entitled to a new trial where the only evidence supporting his conviction was testimony that the district court had

expressly deemed incredible). We find no abuse of discretion.

**C. Exclusion of Evidence/Right to Present a Defense**

Alternatively, Peterson asks us to order a new trial on the M&I fraud counts because the judge deprived him of a meaningful opportunity to present a defense by limiting the testimony of Maverick's accountant, Rick Vanden Heuvel. We review this constitutional claim de novo, "taking into account the permissible scope of the district court's discretion in evidentiary matters." *United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012) (quotation marks omitted). The constitutional right to present a defense—guaranteed to all criminal defendants as a matter of due process, the Sixth Amendment confrontation right, or both, *see Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)—is not absolute; a judge may exclude evidence that is cumulative or only marginally relevant, *Laguna*, 693 F.3d at 730.

The judge allowed Peterson's counsel to question Vanden Heuvel about Maverick's 2006 financial records, and this examination included specific questions about a $900,000 shareholder distribution recorded for that year. But counsel was *not* permitted to ask Vanden Heuvel about the breakdown of that distribution—specifically, whether the $900,000 figure included a $300,000 wire transfer—because this line of inquiry lacked foundation. Vanden Heuvel testified that he had never seen Maverick's general ledger, which is the only record that would have identified the individual components of the $900,000 distribution. Peterson's counsel presented other evidence on this point, including the testimony of Monika Buhler (Maverick's

bookkeeper who was responsible for maintaining the general ledger) and the general ledger itself.

The judge's limitation on Vanden Heuvel's testimony was entirely appropriate; the witness had never seen the general ledger and had no first-hand knowledge of the distribution or its subsidiary parts. The limitation did not in any event deprive Peterson of his right to present a complete defense, not least because he was allowed to make his point through another witness.

**D. Jury Instruction on Bank Fraud**

Over Peterson's objection the judge gave the following jury instruction on bank fraud: "A bank's negligence or lack of diligence in uncovering the fraud is not a defense to the crime charged." Peterson renews his objection on appeal. We review de novo whether the jury instruction was an accurate statement of the law; the judge's decision to give a particular instruction gets deferential review, for abuse of discretion only. *United States v. McKnight*, 665 F.3d 786, 790–91 (7th Cir. 2011). "If the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal." *Id.* at 790 (quotation marks omitted).

Peterson does not argue that the instruction inaccurately stated the law, nor could he. *See, e.g.*, *United States v. Berman*, 21 F.3d 753, 757 (7th Cir. 1994) ("[C]ontributory negligence is not a defense to fraud."). Instead he claims the instruction was unnecessary because he never raised negligence as a possible defense to bank fraud. He insists that it was *the prosecutor* who put the conduct of the banks at issue by eliciting testimony from bank employees that they made

mistakes in approving the various draw requests. To the extent that his own counsel also explored the circumstances surrounding the draw requests, Peterson says it was solely for the purpose of demonstrating that "he sought, and spent, loan money according to the rules, not that the bank officials were negligent in failing to discover otherwise."

This argument rests on a distinction without a difference. Peterson put the conduct of the banks at issue throughout the trial, emphasizing the fact that his draw requests were routinely approved and suggesting that the bank's approval showed that his conduct was proper. This implicitly left the impression that negligence was a possible defense. The judge was right to give the instruction.

### E. Joinder of the Pension-Theft Count

Finally, Peterson challenges joinder of the pension-theft count for trial with the other counts in the indictment. He claims that joinder was improper because pension theft is a distinct statutory offense and in this case involved different victims and occurred during a different time period than the other counts. He also argues that even if joinder were proper, the judge should have granted his motion to sever the pension-theft count because a joint trial risked undue prejudice.

Whether joinder was proper is a question of law subject to de novo review. *United States v. Quilling*, 261 F.3d 707, 713 (7th Cir. 2001). Rule 8(a) of the Federal Rules of Criminal Procedure permits joinder of two or more offenses in a single indictment if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute part of a common scheme or

plan." Offenses may be "of similar character" even if they are not connected in time or by evidence. *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994) ("This language in Rule 8(a) is a rather clear directive to compare the offenses charged for categorical, not evidentiary similarities."). Here the pension-theft count—like each of the other counts charged in the indictment—involved Peterson's use of his business ventures to obtain money by dishonest means. This categorical similarity is sufficient to support joinder under Rule 8(a).

When the initial joinder is proper, we review the district court's denial of a motion to sever for abuse of discretion. *United States v. Turner*, 93 F.3d 276, 283 (7th Cir. 1996). Rule 14 of the Federal Rules of Criminal Procedure allows a district judge to order separate trials where joinder of charges would result in prejudice. The defendant "bears a heavy burden on appeal when arguing that … prejudice warranted severance." *United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008). It is not sufficient that the defendant would have had a better chance of acquittal in separate trials; rather, the defendant must demonstrate actual prejudice by showing that he was unable to obtain a fair trial without severance. *Id.*

One way in which joinder may result in actual prejudice is "by creating a 'spill-over effect'—that is, that the jury relies on evidence presented on one set of counts when reaching a conclusion on the other set." *Id.* at 628. To show prejudicial spillover, a defendant "must overcome the dual presumptions that a jury will capably sort through the evidence and will follow limiting instructions from the court to consider each count separately." *Turner*, 93 F.3d at 284.

Peterson cannot overcome either of these presumptions. The judge properly instructed the jury to separately consider each charge and the evidence supporting it. We have said that instructions of this type provide "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Berardi*, 675 F.2d 894, 901 (7th Cir. 1982). We have also recognized that where, as here, the jury returns a guilty verdict on only some of the counts charged in the indictment, we can be confident that the jurors were able "to sift the evidence and to weigh the merits of each count separately." *Id.* at 902. Accordingly, severance of the pension-theft count under Rule 14 was not necessary to avoid unduly prejudicial spillover effect.

## F. Gross-Receipts and Total-Loss Calculations

Moving now to sentencing arguments, Peterson challenges the judge's calculations of the gross receipts and total loss associated with his fraud for purposes of arriving at his recommended sentence range under the guidelines. We review the judge's application of the guidelines de novo but defer to her findings of fact unless they are clearly erroneous. *United States v. Irby*, 240 F.3d 597, 599 (7th Cir. 2001).

### 1. *Gross Receipts*

Section 2B1.1(b)(16)(A) of the Sentencing Guidelines provides for a two-level enhancement where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." To calculate a defendant's gross receipts, application note 12 states that "the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross

receipts to the defendant *individually, rather than to all partici-pants*, exceeded $1,000,000." (Emphasis added.)

Based on Peterson's misappropriation of the $300,000 wire transfer from M&I and $816,169 of the Greenwoods loan, the judge determined that Peterson's gross receipts from the fraud totaled $1,116,169. Peterson accepts that the money he used to pay off personal gambling debts (the entire $300,000 wire transfer from M&I and $300,000 of the Greenwoods loan) was properly attributed to him individually. He maintains, however, that the funds he used to pay debts owed by Peterson Properties and Maverick—$516,169 of the Greenwoods loan—should not have been included in his total gross receipts from the fraud.

This argument is flawed. By its terms application note 12 contemplates a fraud with multiple participants. The policy underlying this note is that "each dollar count once" when allocating fraud proceeds between the defendants for sentencing purposes. *See United States v. Castellano*, 349 F.3d 483, 487 (7th Cir. 2003). Here Peterson is the sole perpetrator of the fraud, so the application note doesn't apply.

Peterson relies on *Castellano*, but the fraud in that case involved multiple participants. There three codefendants—two individuals and their closely held corporation—were charged with wire fraud. The defendants used fraudulently obtained loans to finance the construction costs necessary to keep their home-building business afloat. All loan proceeds went directly to the corporation, and the individual defendant who challenged his sentence received less than $200,000 of the funds as either salary or reimbursement of expenses from the corporation. The district court attributed all of the ill-gotten proceeds to the individual defendant solely be-

cause he was the founder and manager of the corporation. In vacating that defendant's sentence, we emphasized that the district court improperly disregarded corporate formalities for purposes of calculating gross receipts while recognizing the corporation as a separately charged entity. *Id.* at 487.

Here, in contrast, Peterson was the sole participant in the fraud perpetrated on Greenwoods and maintained complete control over the distribution of all of the proceeds of his fraud. That he chose to spend some of the money he fraudulently obtained to pay off debts owed by Maverick and Peterson Properties is irrelevant for purposes of calculating his gross receipts. *Cf. United States v. Edelkind*, 467 F.3d 791, 801 (1st Cir. 2006) (holding that fraud proceeds are attributable to a defendant who controls disbursement of those proceeds even if he causes legal ownership to be lodged in another person or entity). The judge correctly determined that Peterson's gross receipts totaled more than $1 million and thus appropriately applied a two-level sentencing enhancement under § 2B1.1(b)(16)(A).

### 2. *Total Loss*

Under U.S.S.G. § 2B1.1(b)(1)(I), a 16-level enhancement applies to a fraud that results in total loss of more than $1 million. Application note 3(E)(i) explains that "[t]he money returned … by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected" should be subtracted from the total loss amount. *See also United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003).

The judge applied the 16-level enhancement based on a total loss amount of $1,116,169—again, the sum of the

$300,000 loss from the M&I wire transfer and the $816,169 loss from the Greenwoods loan. Peterson argues that the $300,000 wire transfer should not have been included because he repaid that amount in full prior to detection of his fraud.

The government now concedes that this repayment occurred before Peterson's fraud was detected. Subtracting $300,000 from the total loss calculation leaves only $816,169. A 14-level enhancement applies to this total loss amount. *See* U.S.S.G. § 2B1.1(b)(1)(H). Peterson is entitled to resentencing.

Accordingly, we VACATE the sentence and REMAND for resentencing. In all other respects the judgment is AFFIRMED.